**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| BOBBIE GRANT HENDERSON, | : | Civil Action No. 02-4338 (MLC) |
| | : | |
| Petitioner, | : | **OPINION** |
| | : | |
| v. | : | |
| | : | |
| ROY L. HENDRICKS, et al., | : | |
| | : | |
| Respondents. | : | |

---

**APPEARANCES:**

BOBBIE GRANT HENDERSON, Petitioner Pro Se
SBI #227945B/#200265
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625

MARK P. STALFORD, ESQ.
Monmouth County Prosecutor's Office
71 Monument Park
Freehold, New Jersey 07728-1789
Attorney for Respondents

**COOPER, District Judge**

This matter is before the Court on petitioner Bobby Grant Henderson's application for habeas corpus relief under 28 U.S.C. § 2254. For the reasons stated below, the petition for habeas relief will be denied for failure to make a substantial showing of a federal statutory or constitutional deprivation.

I.  BACKGROUND

A.  Procedural History

Petitioner, Bobby Grant Henderson ("Henderson"), is
presently confined at the New Jersey State Prison in Trenton, New
Jersey, serving a life sentence with a 30 year parole
disqualifier on a robbery and felony murder conviction.

On November 4, 1987, a Monmouth County Grand Jury indicted
Henderson on one count of robbery in the second degree, in
violation of N.J.S.A. 2C:15-1; and one count of first degree
felony murder, in violation of N.J.S.A. 2C:11-3a(3).  (Pl. Br.,
at 1.)

On May 2 and 3, 1988, a Miranda[1] hearing was conducted
before the Honorable Laurence C. Stamelman, J.S.C., regarding the
admissibility of Henderson's confession made to the police on
September 24, 1987.  (Id.; Def. Br., at 1.)  The court ruled that
the statement was admissible and a jury trial commenced shortly
thereafter.  (Id.)

On May 13, 1988, a mistrial was declared because the jury
was unable to reach a verdict.  (Id.)  Henderson was retried, and
another mistrial was declared on January 11, 1989 because the
jury could not reach a verdict.  (Id.)  A third jury trial was

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

2

held on December 11, 1989, before the Honorable John A.
Ricciardi, J.S.C.  (Id.)  On December 21, 1989, the jury found
Henderson guilty on both counts in the indictment.  (Pl. Br., at
1.)  Judge Ricciardi sentenced Henderson on January 19, 1990, to
life imprisonment with a 30-year parole disqualifier.[2]  (Id.;
Def. Br., at 2.)

Henderson filed a direct appeal on March 6, 1990.  (Id.)
The New Jersey Appellate Division affirmed the sentence and
conviction on February 19, 1992.  (Pl. Br., at 2.)  The New
Jersey Supreme Court denied certification on June 26, 1992.
(Id.)  On November 10, 1992, Henderson filed a federal habeas
petition in the District of New Jersey.  (Id.)  He withdrew the
petition and the court dismissed same without prejudice on
January 12, 1993.  (Id.)

On March 21, 1994, Henderson filed his first motion in state
court for post-conviction relief ("PCR").  (Id.)  A hearing was
held before Judge Ricciardi on June 3, 1994, and the court denied
the PCR motion by order entered on June 8, 1994.  (Id.)

---

[2] This sentence was to be served consecutive to other
sentences Henderson was serving at the time.  In addition, the
court merged the robbery count into the felony murder count for
sentencing purposes.

3

Henderson appealed and, on May 7, 1996, the Appellate Division affirmed the order denying the PCR motion.  (Id.)

Henderson filed a second PCR motion on February 4, 1997, which was dismissed without prejudice as deficient on March 7, 1997.  (Id.; Def. Br., at 4.)  Henderson moved to have his second PCR motion re-opened on February 17, 1999, and the matter was reinstated as if properly filed as of February 4, 1997.  (Def. Br., at 4.)  However, on September 10, 1999, Judge Ricciardi held that the motion was procedurally barred and without substantive merit.  (Id. at 5.)  An order to this effect was entered on September 14, 1999.  (Id.)  Henderson promptly appealed, and the Appellate Division affirmed, in a per curiam opinion filed on October 5, 2001.  (Id.)  The New Jersey Supreme Court denied certification on February 26, 2002.  (Id.)

Henderson filed this federal habeas petition on August 28, 2002.[3]  (Dkt. entry no. 1.)  Respondents filed an answer to the

---

[3] The petition was signed and dated by Henderson on August 28, 2002.  The Court finds that Henderson "filed" his habeas petition on the date he handed it to prison officials to be mailed to the Court for filing.  See Houston v. Lack, 487 U.S. 266, 276 (1988); Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) (incorporating the "mailbox rule" for habeas petitions submitted by inmates confined in an institution).  However, because the Court does not know the exact date on which Henderson handed his petition to prison officials for mailing, it will use the date on which he signed his petition, August 28, 2002.

petition on May 23, 2003, together with the relevant state court record. (Dkt. entry no. 12.) The respondents do not raise any affirmative defenses of time-bar, non-exhaustion, or procedural default.[4] Rather, the State argues that the claims are substantively meritless.

B.   Factual Background

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference under 28 U.S.C. § 2254(e)(1), will reproduce the New Jersey Appellate Division's factual recitation, as set forth on direct appeal:

> The charges against defendant arose as a result of the 7:30 p.m. August 20, 1987 beating and robbery of the victim, Thomas Boles, in Neptune City. Witness Christopher Johnson observed a black man with short hair strike Boles in the neck and head, causing Boles to fall to the ground. The man removed Boles' wallet from his pocket and fled. Johnson was unable to identify the assailant, but did recall that the man was wearing a white T-shirt, dark pants, dress shoes, and was approximately 6'3". Other witnesses also observed a black man running in the area who generally matched the assailant's description, but were unable to identify him. Officer Neaves of the Neptune City Police Department responded to the scene and found Boles lying on the ground, face down, bleeding from the

---

[4] The Court finds that Henderson has fully exhausted all claims raised in this petition before the state courts on direct and collateral review. Accordingly, the Court will review the claims for substantive merit under 28 U.S.C. § 2254(d).

back of the head.  He was transported to the intensive
care unit of Jersey Shore Medical Center for treatment.

At approximately 9:30 p.m., a Neptune City police
officer was patrolling the crime area and observed
defendant urinating in the bushes outside of the
Charlene Motel.  Defendant identified himself as
"Robert Grant" and advised the officer that he lived in
room 47 at the motel.  A warrant check, using the
social security number of "Robert Grant", came back
negative.  Defendant was not taken into custody.

A blood hound dispatched by the Neptune City Police
tracked the scent of the defendant to the office area
of the Charlene Motel.  The officers thereupon spoke to
Charles Clayton, manager of the motel, who advised them
that two men were staying at the motel who fit the
general description of the robbery suspect: Gregory
Moore in room 44 and defendant in room 47.  The
officers searched room 44 and found Moore.  According
to the chief handler of the bloodhound unit, the
bloodhound did not "hit" on Moore or lead the officers
into his room.

According to Clayton, defendant had been residing in
room 47 under the name "Bobby Grant" and was paying
$200 per week in rent.  Clayton testified that on
August 14, defendant paid the rent in two installments,
$145 and $55.  On August 20, defendant told Clayton
that he would return to pay him the week's rent that
was due on the following day.

On September 10, 1987, defendant appeared at the
Neptune Police Department and was given his <u>Miranda</u>
warnings and was questioned by Investigator John
Musiello of the Monmouth County Prosecutor's Office and
officers from the Neptune City Police Department.  He
denied participating in the assault and robbery of
Boles and stated that on the date of the crimes he had
finished work at approximately 5 p.m., picked up
Chinese food and went directly to his room at the
motel.

Defendant was again questioned on September 18, 1987 by Investigator Michael Dowling of the Monmouth County Prosecutor's Office.   After Miranda warnings were given, defendant explained that when he got to the motel at 5 p.m. on the day of the crimes, he showered, changed his clothes, watched television and went to buy Chinese food for himself and his girlfriend, Pamela Downing.   Later he went to the courtyard to buy soda. A short time later, when he observed the police talking to Moore's girlfriend, he fled.   He also acknowledged he was wearing a white T-shirt and dark blue pants at the time.   He maintained his innocence.

On September 23, 1987, Boles died as a result of the injuries he sustained during the August 20, 1987 assault and robbery.   On September 24, 1987, defendant was again questioned at the prosecutor's office after Investigator Dowling read defendant his Miranda rights. At that point, defendant admitted robbing Boles.   He acknowledged confronting Boles, pushing him to the ground and taking his wallet which contained $27.

At trial, defendant denied committing the crimes.   He stated he confessed because he thought that if he did not the police would lock up Downing and put the children he had with her in a foster home.

New Jersey v. Henderson, No. 3447-89T4, at 2-4 (N.J. App.

Div. Feb. 19, 1992).

With respect to the Miranda hearing, the Appellate Division

found:

At the suppression hearing, Investigator Dowling testified that on September 16, 1987 he interviewed defendant's girlfriend, Pamela Downing.   Dowling warned Downing that she might be called to testify before a grand jury and if she lied, she would be in trouble. On September 24, 1987, defendant was brought to the Monmouth County Prosecutor's Office to take a polygraph

7

test.  Prior to the test defendant was read his <u>Miranda</u>
warnings.  After the test was administered, defendant
was again read his <u>Miranda</u> warnings and was advised he
had failed the polygraph test.  Dowling then told
defendant that the investigation into the robbery and
assault of Boles "was continuing" and "[t]hat lineups
containing [defendant's] photograph were going to [be]
shown to witnesses."  Dowling admitted at the hearing
that defendant's photograph had already been shown to
the eyewitnesses, who were unable to identify him.
Dowling also advised defendant that all of the
eyewitnesses had given accounts of the incident which
substantially differed from defendant's.  He further
told defendant that if any of the witnesses identified
him as the perpetrator he would be charged with
"assault and theft" and that any sentence imposed for
the crimes would be in addition to the time he was
serving on an escape charge.  Dowling admitted he
purposely did not tell defendant that Boles had died
because he did not believe he was required to disclose
that fact, and further because defendant would be more
"willing to speak to us about a robbery and assault
more than a murder."  Dowling explained that this was
"a tactic that I frequently use when I'm speaking to
people that I am convinced committed the crime."
Dowling also acknowledged advising defendant that
Pamela Downing would be called before the grand jury
and that if she lied "she could be in trouble."  At
this point, defendant agreed to give a statement.

In denying defendant's motion to suppress his
statement, the trial court found that under the
"totality of the circumstances" defendant voluntarily
gave his confession after <u>Miranda</u> warnings were
administered.  The court found that defendant fully
understood his rights and knowingly and intelligently
waived them.  It reasoned that the fact defendant was
not told that Boles died did not, standing alone, make
defendant's confession inadmissible.  Further, the
court found that the other "misrepresentations" made by
Dowling regarding prospective identification of
defendant by witnesses and threats of incarcerating

defendant's girlfriend were not so coercive as to make the statement inadmissible.

(Id. at 5-6.)

## II.   CLAIMS FOR HABEAS RELIEF

Henderson raises the following claims in his federal habeas petition:

Ground I:  The acquisition and use of petitioner's statements violated his rights under the United States Constitution because the statements were involuntarily made without a proper waiver of his rights.

Ground II:  The trial court erred in failing to give the jury a corroboration charge sua sponte.

Ground III:  Petitioner was denied effective assistance of trial, appellate, and post-conviction relief counsel.  (Dkt. entry no. 1.)

## III.   STANDARD GOVERNING REVIEW OF § 2254 CLAIMS

The Court recognizes that a pro se pleading is held to less stringent standards than more formal pleadings drafted by attorneys.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  Thus, a pro se habeas petition should be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Duarte v.

9

Hurley, 43 F.Supp.2d 504, 507 (D.N.J. 1999).  Because Henderson

is a pro se litigant, the Court will accord his petition the

liberal construction intended for pro se petitioners.

Under § 2254, as amended by the Anti-Terrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas

matters must give considerable deference to determinations of the

state trial and appellate courts.  See 28 U.S.C. § 2254(e);

Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001); Dickerson v.

Vaughn, 90 F.3d 87, 90 (3d Cir. 1996) (citing Parke v. Raley, 506

U.S. 20, 36 (1992)).  Section 2254(d) sets the standard for

granting or denying a habeas writ:

> (d)  An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the
> adjudication of the claim -
>
> (1)  resulted in a decision that was contrary
> to, or involved an unreasonable
> application of, clearly established
> Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on
> an unreasonable determination of the
> facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the Supreme
Court explained that subsection (d)(1) involves two clauses or
conditions, one of which must be satisfied before a writ may
issue.  The first clause, or condition, is referred to as the
"contrary to" clause.  The second condition is the "unreasonable
application" clause.  <u>Williams</u>, 529 U.S. at 412-13.  In the
"contrary to" clause, "a federal habeas court may grant the writ
if the state arrives at a conclusion opposite to that reached by
[the Supreme] Court on a question of law or if the state court
decides a case differently than [the Supreme] Court has on a set
of materially indistinguishable facts."  <u>Id.</u>  Under the
"unreasonable application" clause, a federal court may grant the
writ if "the state court identifies the correct governing legal
principle from [the Supreme] Court's decisions but unreasonably
applies that principle to the facts of [the petitioner's] case."
<u>Id</u>. at 413.  Habeas relief may not be granted under the
"unreasonable application" condition unless a state court's
application of clearly established federal law was objectively
unreasonable; an incorrect application of federal law alone is
not sufficient to warrant habeas relief.  <u>Id.</u> at 411.  <u>See also</u>
<u>Werts v. Vaughn</u>, 228 F.3d 178, 197 (3d Cir. 2000); <u>Matteo v.</u>
<u>Superintendent, SCI Albion</u>, 171 F.3d 877, 891 (3d Cir. 1999).

Consonant with Williams, the Third Circuit has held that §
2254(d)(1) requires a district court to make a two-step inquiry
of a petitioner's claims.  First, the court must examine the
claims under the "contrary to" provision, identify the applicable
Supreme Court precedent, and determine whether it resolves
petitioner's claims.  See Werts, 228 F.3d at 196-97; Matteo, 171
F.3d at 888-91.  If the federal court determines that the state
court's decision was not "contrary to" applicable Supreme Court
precedent, then the court takes the second step of the analysis
under § 2254(d)(1), which is to evaluate whether the state court
unreasonably applied the Supreme Court precedent in reaching its
decision.  Werts, 228 F.3d at 197.

This second step requires more than a disagreement with the
state court's ruling because the Supreme Court would have reached
a different result.  Id.  AEDPA prohibits such de novo review.
Rather, the district court must determine whether the state
court's application of the Supreme Court precedent was
objectively unreasonable.  Id.  In short, the federal court must
decide whether the state court's application of federal law, when
evaluated objectively and on the merits, resulted in an outcome
that cannot reasonably be justified under existing Supreme Court

precedent.  Id.; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d
Cir. 2005).

Finally, federal courts are required to apply a "presumption
of correctness to factual determinations made by the state
court." Id.; see also 28 U.S.C. § 2254(e)(1).  The Third Circuit
has ruled that this presumption of correctness based upon state
court factual findings can only be overcome by clear and
convincing evidence.  See Duncan, 256 F.3d at 196 (citing 28
U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must
clear a high hurdle before a federal court will set aside any of
the state court's factual findings." Mastracchio v. Vose, 274
F.3d 590, 597-98 (1st Cir. 2001).

IV.  ANALYSIS

A.  Admissibility of the Confession

In his first claim for habeas relief, Henderson asserts that
his confession was not voluntary due to alleged coercion and
misleading statements made by the police.  (Pl. Br., at 26.)
Accordingly, the acquisition and use of his statement violated
the Fifth Amendment and the confession should not have been
admitted at trial.  (Id.)

Henderson does not allege any procedural deficiencies with
respect to the Miranda warnings given to him by the police.

Rather, he claims that the police deceived him and coerced him into making a confession.  (Id. at 34-36.)  In particular, Investigator Dowling did not tell him on September 24, 1987 that the victim had died, and that Henderson would be facing a murder charge.  (Id. at 37.)  Dowling also falsely told Henderson that the police would show lineups with his photograph to witnesses, and that if he was identified, he would be charged with assault and theft.  (Id. at 34-36.)  Dowling further told Henderson that the information accounts obtained from witnesses were substantially different from what Henderson had told the police.  (Id.)  Lastly, Dowling told Henderson that a grand jury would be convened and Henderson's girlfriend would have to testify.  (Id.)  If she lied, she would be in trouble.  (Id.)  At that point, Henderson agreed to tell Dowling what happened, and he confessed to robbing Boles.  (Id. at 36-37.)  Henderson claims that Dowling told him that his girlfriend might lose her children if she did not testify truthfully.  (Id.)  This was not corroborated by Dowling's testimony at the Miranda hearing.  (Def. Br., at 18.)

The State argues that the statements were voluntarily made, without improper threats or coercion, and were properly admitted at trial.

14

1.  *Validity of the Waiver*

Henderson raised this claim on his direct appeal.  The
Appellate Division first discussed whether Henderson's waiver of
his Miranda rights was made with a full awareness of the nature
of the right being abandoned and the consequences of the decision
to abandon it.  The court commented that "Miranda does not impose
a per se duty upon the investigating officers to inform a
detainee of the nature of the charges being investigated prior to
questioning him.  All Miranda requires is that prior to
questioning, the person must be warned that: (1) he has the right
to remain silent; (2) any statement he makes may be used as
evidence against him; and (3) he has the right to the presence of
an attorney, either retained or appointed. [Miranda, 384 U.S. at
383]."  New Jersey v. Henderson, No. 3447-89T4, at 7 (N.J. App.
Div. Feb. 19, 1992).

The court also looked to Colorado v. Spring, 479 U.S. 564
(1987), in which the Supreme Court held that the Constitution
"does not require that a criminal suspect know and understand
every possible consequence of a waiver of the Fifth Amendment."
479 U.S. at 574.  In Spring, the defendant was in custody for
illegal firearms transportation, but the agents who interrogated
him failed to disclose that he was also a suspect in a Colorado

15

homicide.  While questioning the defendant about arms shipments,
the agents asked the defendant if he had ever killed anyone, in
particular, if he had shot a man in Colorado.  The defendant
confessed to the Colorado killing.  The Court found that
defendant's waiver was knowing, voluntary, and intelligently made
despite the agents' failure to disclose the fact that they were
investigating a murder prior to the interrogation.  The Court
upheld the admission of the confession, finding the absence of
the traditional indicia of coercion.  Id. at 574-75.

    The Court in Spring also found that the agents' failure to
disclose the Colorado murder did not constitute "trickery"
sufficient to invalidate the waiver.  The Court stated:

> This Court has never held that mere silence by law
> enforcement officials as to the subject matter of an
> interrogation is "trickery" sufficient to invalidate a
> suspect's waiver of Miranda rights, and we expressly
> decline so to hold today.

Id. at 576.  The Court distinguished the agents' silence from
cases involving affirmative misrepresentations by police, which
would be sufficient to invalidate a suspect's waiver of the Fifth
Amendment.  Id.; see Lynumm v. Illinois, 372 U.S. 528, 534 (1963)
(confession involuntary when given after an express threat that
defendant's children would be taken away from her if she did not
cooperate).  But see Frazier v. Cupp, 394 U.S. 731, 739 (1969)

(confession is not involuntary simply because police misrepresented to defendant that the co-defendant had confessed). The Court reasoned that once Miranda warnings are given "it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right – 'his right to refuse to answer any question which might incriminate him.'" Spring, 479 U.S. at 576 (quoting United States v. Washington, 431 U.S. 181, 188 (1977)).

In this case, the Appellate Division applied the principles set forth above and was satisfied that Dowling's failure to disclose the fact of Boles' death "did not 'in a constitutionally significant manner' affect [Henderson's] decision to waive his fifth amendment privilege." New Jersey v. Henderson, No. 3447-89T4, at 10 (N.J. App. Div. Feb. 19, 1992). The court found:

> Defendant had been advised of his Miranda rights several times prior to giving the statement and the suppression record is clear that he understood his rights fully prior to the waiver. As in Spring, it is difficult to conceive how silence respecting the death of the victim could have caused the defendant to misunderstand his right to refuse to give the statement. In short, the withheld information could have affected "only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature." [Spring, 479 U.S. at 577]

Id. at 10-11.

17

2.  *Voluntariness of Confession*

Next, the Appellate Division looked to the second component of Henderson's argument, that misrepresentations and threats made by Dowling served to coerce his confession, rendering his statement involuntary.  At issue was the alleged threat about petitioner's girlfriend, in which Dowling allegedly said that if she lied before the grand jury, her children would be taken away. Also, Dowling told Henderson that he would be showing his photograph in a lineup to witnesses for the purpose of identifying Henderson as the culprit, when in fact the witnesses had already been shown Henderson's picture and were unable to identify him.

The Appellate Division applied the "totality of the circumstances" test, as employed in Schneckloth v. Bustamonte, 412 U.S. 218 (1973) and Miller v. Fenton, 796 F.2d 598 (3d Cir. 1986).  The court noted that an involuntary confession may result from psychological coercion, citing Miller, 796 F.2d at 603, but a police misrepresentation of a fact does not per se render a confession involuntary.  See Frazier v. Cupp, 394 U.S. at 739; Miller, 796 F.2d at 609.  Thus, looking at the totality of circumstances in this case, the court concluded that Henderson's confession was voluntary:

18

The officers' statement about defendant's girlfriend was not a misrepresentation, and if it were, it cannot be deemed to be so coercive as to have overborne defendant's will. Investigator Dowling stated to defendant that if his girlfriend lied in testimony before a grand jury "she could be in trouble." This is true. If she had lied before the grand jury, she may well have been charged and convicted of perjury and, assuming the children had no other place to go, they may well have been placed in a foster home.

Investigator Dowling's statement that he intended to show witnesses defendant's photograph for purpose of identification was untrue. However, as stated, a misrepresentation is a factor, but not the only factor, to be considered in determining whether a confession is voluntary. Frazier, 394 U.S. at 739. "A confession induced by deception or trickery is not inadmissible unless the method used was calculated to produce an untruthful confession or was offensive to due process." State v. Manning, 165 N.J. Super. 19, 30-31 (App. Div. 1978), rev'd on other grounds, 82 N.J. 417 (1980), (quoting Wharton, Criminal Evidence §685 at 471-74 (13th ed. 1973)). In appraising the misstatement in the context of the totality of circumstances, we agree with the trial court that it did not render the statement involuntary. Defendant was 26-years old at the time of the interrogation, was a high school graduate, appears to be intelligent from the transcript, had a criminal record and had escaped from a half-way house in Trenton. He was only interrogated for two hours and during that time he was offered food and cigarettes. There is no evidence of physical coercion and defendant was advised of his rights twice during the course of the interrogation. Defendant's statement was properly admitted into evidence.

New Jersey v. Henderson, No. 3447-89T4, at 12-13 (N.J. App.

Div. Feb. 19, 1992.

3.  *The State Court Ruling Was Reasonable*

After careful review of the record, this Court finds that the Appellate Division ruling on the issue of waiver and the voluntariness of Henderson's confession was a reasonable determination of the facts given the evidence presented at the Miranda hearing.  Further, the state courts' decision involved a reasonable application of clearly established federal law.

In Miranda, the Supreme Court held that in order to protect an accused's Fifth Amendment right against self-incrimination during the inherently coercive custodial interrogation setting, certain procedural safeguards must be employed.  These safeguards include the explicit warning that the accused "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires."  Miranda, 384 U.S. at 479.

Miranda also provides that the accused may waive his rights, but must do so "voluntarily, knowingly and intelligently".  Id. at 475.  In determining whether there has been a valid waiver of Miranda rights, a court must conduct a two-part inquiry under a totality of the circumstances standard.  Moran v. Burbine, 475

U.S. 412, 421 (1986).  First, the court looks to the
voluntariness of the statement, and whether the waiver was freely
and deliberately given as opposed to being obtained by coercion,
intimidation, or deception.  Id.  Second, the court must consider
whether the waiver was "knowingly and intelligently" made, that
is, whether the accused was fully aware "both of the nature of
the right being abandoned and the consequences of the decision to
abandon it."  Id.

     The "totality of the circumstances" approach is applied to
determine whether there has been a voluntary waiver of Miranda
rights.  A court must take into account "both the characteristics
of the accused and the details of the interrogation."
Schneckloth, 412 U.S. at 226.  This approach includes the
evaluation of the subject's age, education, experience,
background, and intelligence, and whether he has the capacity to
understand the warnings given him, the nature of his Fifth
Amendment rights, and the consequences of waiving those rights,
the length of detention, the repeated and prolonged nature of
questioning, and the use of physical punishment such as the

deprivation of food or sleep.[5]  Id.; see also Fare v. Michael
C., 442 U.S. 707, 725 (1979); United States v. Swint, 15 F.3d
286, 289 (3d Cir. 1994).  It looks to the person's familiarity
with the criminal justice system, the timing of the Miranda
warnings and the statement given, and the length and nature of
the interrogation and the accompanying detention.  See United
States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989); United
States v. Vasquez, 889 F.Supp. 171, 177 (M.D. Pa. 1995); see also
Yarborough v. Alvarado, 124 S.Ct. 2140, 2151 (2004) (the
characteristics of the defendant can include the defendant's age,
education, and intelligence, as well as his prior experience with
law enforcement).

Further, "coercive police activity is a necessary predicate
to the finding that a confession is not 'voluntary' within the
meaning of the Due Process Clause of the Fourteenth Amendment."
Colorado v. Connelly, 479 U.S. 157, 167 (1986); see also Arizona
v. Fulminante, 499 U.S. 279, 288 (1991) (a statement is

---

[5] In determining the voluntariness of the confession, New
Jersey state courts have traditionally assessed the totality of
the circumstances surrounding the arrest and interrogation,
including such factors as the accused's "age, education and
intelligence, advice as to constitutional rights, length of
detention, whether the questioning was repeated and prolonged in
nature and whether physical punishment or mental exhaustion was
involved."  State v. Miller, 76 N.J. 392, 402 (1978); see also
State v. Presha, 163 N.J. 304, 313 (2000).

involuntary when the suspect's "will was overborne in such a way
as to render his confession the product of coercion"); <u>Lam v.
Kelchner</u>, 304 F.3d 256, 264 (3d Cir. 2002).  Absent police
overreaching, which is causally related to the confession, "there
is simply no basis for concluding that any state actor has
deprived a criminal defendant of due process of law." <u>Connelly</u>,
479 U.S. at 164.  Thus, beyond the necessary and crucial element
of police coercion, courts look to both the characteristics of
the accused and the circumstances of the interrogation in
considering whether a confession is voluntary.  <u>See, e.g.</u>,
<u>Withrow v. Williams</u>, 507 U.S. 680, 693-94 (1993) (concluding that
the voluntariness of the confession depends upon the totality of
circumstances, including police coercion, length and place of
interrogation, the accused's maturity, education, physical
condition, intelligence, and mental health, as well as "the
failure of the police to advise the defendant of his rights to
remain silent and to have counsel present during custodial
interrogation"); <u>Schneckloth</u>, 412 U.S. at 226 (the voluntariness
of a statement may often depend on whether the accused's will was
overborne, a question that logically turns on the characteristics
of the accused).  The government "need prove waiver only by a
preponderance of the evidence." <u>Connelly</u>, 479 U.S. at 168.

This Court has carefully reviewed the record and finds that the totality of the circumstances in this case clearly weigh in favor of voluntariness, as determined by the trial court.  First, there is no evidence of coercive conduct on the part of the officers.  Henderson was read his rights on each occasion that he was interviewed, and again on September 24, 1987, before he was given the polygraph test.  His confession was given shortly after the interrogation.  He was brought to the prosecutor's office at approximately 10:00 a.m. for administration of the polygraph test, and was then placed in a room at about 12:30 p.m. for interrogation by Dowling.  Dowling spoke to Henderson for about 15 to 20 minutes, and then Henderson confessed.  Henderson received food and cigarettes during this time.  Thus, there was no deprivation of food, sleep, or other physical needs that would otherwise serve to overbear a person's will.

Next, there were no factors concerning Henderson's age, mental condition, or education, suggesting that he did not understand his <u>Miranda</u> rights or the consequences of waiving those rights.

As to the alleged misrepresentation about the extent of the charges against Henderson, the Court finds that Dowling's non-disclosure that the victim had died did not render Henderson's

waiver unknowing and invalid.  This lack of information did not
affect the knowing and voluntary nature of Henderson's <u>Miranda</u>
waiver.

> [W]e have never read the Constitution to require that
> the police supply a suspect with a flow of information
> [including the charges against him] to help him
> calibrate his self-interest in deciding whether to
> speak or stand by his rights.

<u>Spring</u>, 479 U.S. at 576-77 (quoting <u>Moran v. Burbine</u>, 475 U.S.
412 (1986)).  Here, as in <u>Spring</u>, and as determined by the
Appellate Division, the information that the victim died could
affect only the wisdom of Henderson's <u>Miranda</u> waiver, not its
essentially voluntary and knowing nature.  Thus, the failure of
Dowling to inform Henderson of an ancillary subject matter of the
interrogation does not affect the voluntary nature of Henderson's
decision in a constitutionally significant manner.

Next, the Court finds no overreaching or objectively
coercive police conduct that would have overborne petitioner's
will under the circumstances here to make Henderson's waiver
involuntary.  There simply was no constitutionally impermissible
conduct by the police during the September 24, 1987 interrogation
that would impugn the voluntariness of Henderson's confession.
As stated above, there were no physical punishments inflicted on
Henderson – he was not deprived of sleep and food, and he was not

physically threatened or harmed.  The interrogation was short in duration.  The only tactics used by police to induce a confession were to mislead Henderson into believing that his photograph would be shown in a lineup to witnesses for identification purposes (which had already been done with no one able to make an identification), and to suggest that Henderson's girlfriend would be in trouble if she lied during a grand jury testimony.  These police tactics do not suggest the type of overreaching and coercive police conduct that is a necessary predicate to a finding that the confession was involuntarily induced.

During the course of an interrogation, it is generally recognized that the police may use some psychological tactics in eliciting statements from a suspect.  See Frazier v. Cupp, 394 U.S. at 739 (police misrepresentation to defendant that the co-defendant had confessed was not sufficient to make the otherwise voluntary confession inadmissible); Miller v. Fenton, 796 F.2d at 605; State v. Jacks, 634 F.2d 390, 393 (8th Cir. 1980) (representation that cooperation would promote leniency, although no actual promise was made).  The police may "attempt[] to create a climate which would be conducive to extracting inculpatory information."  Id.

26

Given the totality of the circumstances of Henderson's interrogation, the suggestion that his photograph would be used for identification purposes is not constitutionally offensive. As stated above, a criminal suspect is not entitled to all information available to the police during its investigation of a crime.  See Spring, 479 U.S. at 576-77.  In addition, the comment that Henderson's account differed from that of witnesses was not a false or misleading statement.  Henderson had maintained he was not there, and witnesses had given the police a description fitting Henderson's appearance which had been corroborated by the owner/manager of the Charlene Motel.  Further, as to the polygraph test, Henderson had failed the test, thus Dowling's statement to him as to the results was true.

Henderson's main argument, however, asserts that his confession was unlawfully coerced by Dowling's threat that Henderson's girlfriend would lose her children if she lied to the grand jury.  First, the record does not show this allegation to be true.  Dowling admitted only that he told Henderson his girlfriend would have to testify at a grand jury, and if she lied, she would be in trouble.  Second, the Court finds that this comment was not patently coercive.

27

Henderson relies on United States v. Tingle, 658 F.2d 1332 (9th Cir. 1981) to support his claim that the threat about his girlfriend was impermissibly coercive.[6]  In Tingle, to induce the defendant's confession, the agents recited a litany of maximum penalties for crimes of which she was suspected and expressly told defendant that she would not see her two-year old child for a long while and that she had "a lot at stake."  658 F.2d at 1336.  The court found that such statements were plainly coercive and threatening, rendering the resulting confession involuntary. Id.

The situation in Tingle differs markedly from this case. Here, there was no actual threat that Ms. Downing would lose her children.  The investigator merely told Henderson that his girlfriend would be in trouble if she lied to the grand jury. She would have nothing to fear unless she decided to commit

---

[6] Henderson also cites Lynumm, 372 U.S. 528 (1963), in which the Supreme Court held a confession involuntary after an express threat by police that the defendant's children would be taken away from her if she did not cooperate.  Here, there was no express threat to Henderson.  Moreover, the circumstances of the interrogation in Lynumm were very different.  She had been surrounded in her home by police and a twice convicted felon who had "set her up".  She had no prior experience with criminal law, and had reason to believe that the police had the power to enforce their threats to have financial aid for her infant children cut off and to have her children taken away from her. 372 U.S. at 534.

28

perjury at the grand jury.  Furthermore, there was no threat or intimidation that was intended to prey upon Ms. Downing's maternal instinct because the comment was made to Henderson. Thus, there was nothing overtly or impliedly coercive about the investigator's comment to Henderson.  The Court finds <u>United States v. Prince</u>, 157 F.Supp.2d 316 (D. Del. 2001) to be more instructive here.  There, the police told defendant that her children should be her primary concern.  There was no express threat to take her children away, nor was the interrogation intended to intimidate or coerce the defendant by threatening to inform the federal or state prosecutors if defendant did not cooperate.  <u>Prince</u>, 157 F.Supp.2d at 328.  Although Prince may have been fatigued and emotional at times during the interrogation (not at issue here), there was no evidence in the record to establish that her will was overborne.  <u>Id.</u>

Consequently, after careful review of the record, the trial court's findings at the <u>Miranda</u> hearing, and the Appellate Division ruling, this Court cannot conclude that the determination of the trial court in admitting Henderson's statement resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an

29

unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Williams v. Taylor, 529 U.S. 362 (2000). The state courts applied the correct law and facts in reaching its determination that there was no Miranda violation, and that the statement was voluntarily and knowingly given by Henderson. Henderson has failed to demonstrate that the state court opinion, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified. Matteo, 171 F.3d at 891. Therefore, the Court will deny federal habeas relief on this claim because the alleged violation of petitioner's Fifth Amendment rights is substantively meritless.

B.  Failure to Charge Jury on Corroboration

Next, Henderson asserts that the trial court committed reversible error in failing to sua sponte charge the jury on the issue of corroboration with respect to his confession. (Pl. Br., at 41.) He contends that the State had failed to introduce any independent corroborating evidence that would establish the trustworthiness of his confession. (Id.) Without a corroboration charge, Henderson claims that he was unlawfully convicted solely on his own uncorroborated confession. See Smith

v. United States, 348 U.S. 147, 152 (1954)("[A]n accused may not
be convicted on his own uncorroborated confession").

     The State responds that even if Henderson may have been
entitled to a specific corroboration charge, the overall
instructions to the jury with respect to the confession were
sufficient, and the confession was indeed corroborated by
independent facts at trial.  (Def. Br., at 28.)  Further,
Henderson cannot establish that the lack of a corroboration
charge was a clear and obvious error, and if it was, it did not
affect the outcome of the trial.  See United States v. Olano, 507
U.S. 725, 733-34 (1993); United States v. Young, 470 U.S. 1
(1985).

     This issue was raised by Henderson in his PCR motion.  The
PCR court found nothing improper in the jury instructions.
Corroboration was not a "viable issue", and New Jersey case law
required only a Hampton[7] charge, which was given.  (11T, 12:1-
15).  The Appellate Division affirmed the PCR court on appeal,
stating:

          Our review of the record satisfies us that there was
          sufficient evidence corroborating the trustworthiness
          of the confession to support the conviction, including
          defendant's matching of the physical and clothing
          descriptions given to the police by eyewitnesses, the

_____

     [7] State v. Hampton, 61 N.J. 250 (1972).

31

evidence respecting the bloodhound's tracking, and
various details of the confession itself that accorded
with trial evidence.[8]  See generally State v. DiFrisco,
118 N.J. 253, 273 (1990); State v. Abrams, 256 N.J.
Super. 390, 402 (App. Div.), certif. denied, 130 N.J.
395 (1992).  The question then, as we see it, is not
whether there was sufficient evidence to convict beyond
a reasonable doubt but whether defendant was unduly
prejudiced by the absence of an instruction to the jury
explaining the necessity of corroborating the
confession.  We conclude that he was not.

The law is well settled that while the defense may ask
for a specific corroboration instruction, the failure
to do so and the court's failure to charge it sua
sponte will not constitute plain error if the judge has
made clear to the jury its obligation to assess the
weight and credibility in the light of all of the
circumstances and if the question of the confession's
credibility is thoroughly explored at trial.  See,
e.g., [DiFrisco, 118 N.J. at 274-75 ; State v. Ordog,
45 N.J. 347, 364 (1965), cert. denied, 384 U.S. 1022
(1966)].  This is what happened here.  The judge
charged the jury in meticulous accordance with State v.
Hampton, 61 N.J. 250, 272 (1972), instructing it that
it was required "to take into consideration the
circumstances and the facts surrounding the giving of
the statement as well as all the other evidence in this
case" in determining whether the confession was
credible or truthful and explaining that if it was not,
it was required to be disregarded.  Moreover, the
credibility of the statement constituted the entire
thrust of defense counsel's summation, in which he
spent considerable time and effort effectively
reviewing the corroborating evidence, attempting to
explain it away, and stressing its importance.  We are
thus satisfied that this jury could not have failed to

---

[8] For example, defendant had told the police that as he
started to run from the sene of the crime, he noticed a red fire
chief's car parked on the street.  The Neptune fire chief
testified as to the presence of his car next to the victim's
house at the time of the mugging.

understand that its acceptance of the confession depended upon its acceptance of at least some of the evidence corroborating its trustworthiness. We conclude, therefore, that while a specific corroboration charge would have been appropriate, its absence here did not have the capacity to have affected the outcome of this trial. See State v. Macon, 57 N.J. 325 (1971).

New Jersey v. Henderson, No. 6200-93T4, at 3-5 (N.J. App. Div. May 7, 1996).

Questions relating to jury charges are normally matters of state law and are not cognizable in federal habeas review. See Engle v. Isaac, 456 U.S. 107 (1982); Henderson v. Kibbe, 431 U.S. 145 (1977); Zettlemoyer v. Fulcomer, 923 F.2d 284, 309 (3d Cir. 1991); Grecco v. O'Lone, 661 F.Supp. 408, 412 (D.N.J. 1987). Only where the jury instruction is "so prejudicial as to amount to a violation of due process and fundamental fairness will a habeas corpus claim lie." Grecco, 661 F.Supp at 412.

Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied

33

> the challenged instruction in a way" that violates
> the Constitution.   And we also bear in mind our
> previous admonition that we "have defined the
> category of infractions that violate 'fundamental
> fairness' very narrowly."   "Beyond the specific
> guarantees enumerated in the Bill of Rights, the
> Due Process Clause has limited operation.

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations

omitted).  Thus, the Due Process Clause is violated only where

"the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state

law."  Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997); see also

In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause

protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the

crime with which he is charged"); Sandstrom v. Montana, 442 U.S.

510, 523 (1979) (jury instructions that suggest a jury may

convict without proving each element of a crime beyond a

reasonable doubt violate the constitutional rights of the

accused).

    Where such a constitutional error has occurred, it is

subject to "harmless error" analysis.  Smith, 120 F.3d at 416-17;

Neder v. United States, 527 U.S. 1, 8-11 (1999).

"[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." Smith, 120 F.3d at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged instruction,

> a single instruction to a jury may not be judged
> in artificial isolation, but must be viewed in the
> context of the overall charge.  If the charge as a
> whole is ambiguous, the question is whether there
> is a reasonable likelihood that the jury has
> applied the challenged instruction in a way that
> violates the Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).

Here, the state appellate court determined that there was sufficient other evidence at trial to corroborate the trustworthiness of the confession and support the conviction. The court delineated this corroborating evidence, and the trial record supports the court's conclusion.  Further, the court found that the trial court's failure to sua sponte charge the jury on the issue of corroboration was not plain error because there was ample instruction to the jury with respect to its obligation to assess the weight and credibility of the confession in light of all the evidence.  The trial court also gave a Hampton charge

35

that instructed the jury to "take into consideration the circumstances and the facts surrounding the giving of the statement, as well as all the other evidence in this case.  So you have to look at the entire case and all of the evidence including that surrounding the circumstances."  (8T, 146:17-21).

Thus, this Court finds that there was no need for the trial court to <u>sua</u> <u>sponte</u> charge the jury on specific corroboration because there was adequate instruction to the jury to give consideration to all the evidence introduced at trial in assessing the credibility of the confession. Moreover, even if it was error not to charge the jury specifically on corroboration, the lack of such a charge did not affect the outcome of the trial.  There was sufficient other evidence at trial corroborating the trustworthiness of the confession to support the conviction.

Finally, Henderson fails to point to a federal requirement that a specific corroboration instruction was required; nor can he demonstrate that the lack of the proposed charge deprived him of a defense which federal law provided to him.  <u>Johnson v. Rosemeyer</u>, 117 F.3d 104, 110 (3d Cir. 1997).  Accordingly, this claim is substantially without merit and federal habeas relief will be denied.

C.  Ineffective Assistance of Counsel

Henderson finally complains that he had ineffective assistance of counsel at every stage of his state court proceedings.  (Pl. Br., at 55.)  With respect to the claim that his PCR counsel was ineffective, the Court will dismiss that claim pursuant to 28 U.S.C. § 2254(i), which states that the ineffectiveness or incompetence of counsel during state collateral PCR proceedings shall not be ground for federal habeas relief under § 2254.

1.  *Ineffective Assistance of Trial Counsel*

With respect to his trial counsel, Henderson contends that counsel was constitutionally deficient in failing to request a specific corroboration charge and a <u>Kociolek</u>[9] charge.  (<u>Id.</u> at 56.)  This claim was raised and denied in Henderson's first PCR proceeding.  On appeal, the Appellate Division, citing <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), affirmed the denial of the PCR motion, finding that, "[b]ecause the prejudicial-error standard was not met, we also conclude that defendant has failed to show remediable ineffectiveness of assistance either by his trial counsel or his appellate counsel."

---

[9]  <u>State v. Kociolek</u>, 20 N.J. 92 (1955).

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  Id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir. 2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. at 688.  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

> counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v. Weatherwax, 77 F.3d 1425, 1431 (3d Cir. 1996).

If able to demonstrate deficient performance by counsel, Henderson must also show that counsel's substandard performance actually prejudiced his defense. Strickland, 466 U.S. at 687. Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The reviewing court must evaluate the effect of any errors in light of the totality of the evidence. Id. at 695-96. Thus, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim. Id. at 697. See also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

Here, even if trial counsel was deficient in failing to request the specific corroboration charge and a _Kociolek_ charge, the court found that such error was not prejudicial because it would not have affected the outcome of the trial.  Thus, petitioner has not satisfied the second prong under _Strickland_.

Indeed, as set forth above on the issue of the corroboration charge, there is nothing in the record to indicate that the state court decision on this issue was based on an unreasonable application of the facts in light of the evidence presented at trial.  Nor was the court's decision contrary to established federal law set forth in _Strickland_.  Thus, Henderson has not demonstrated that the state court decision, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  _Matteo_, 171 F.3d at 891.  Therefore, on this claim, the Court concludes that Henderson has failed to demonstrate ineffective assistance of trial counsel as required under _Strickland_, and the claim will be denied.

2.  _Ineffective Assistance of Appellate Counsel_

Henderson also asserts that his appellate counsel was ineffective for failing to advance on appeal a claim of plain error with respect to the trial court's failure to give a _sua sponte_ corroboration and _Kociolek_ charge to the jury.  (Pl. Br.,

at 64.)  This claim was raised in petitioner's PCR proceedings, and was denied, as noted above.

Claims of ineffective assistance of appellate counsel are evaluated under the Strickland standard discussed above.  See Wright v. Vaughn, No. 00-3822, 2004 WL 1687865, at *6, n.10 (E.D. Pa. July 26, 2004).  In order to prevail on a claim that appellate counsel was ineffective, Henderson must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there was a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal.  See Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999).

Here, Henderson has failed to show that the performance of his appellate counsel was deficient and that he was prejudiced thereby, and in light of the evaluation of this issue by the state courts, this Court cannot conclude that the determination of this issue resulted in a decision that was contrary to, or involved an unreasonable application or determination of law or fact.  Williams v. Taylor, 529 U.S. 362 (2000).  Accordingly, the Court will deny relief on this claim.

41

V.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  See Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by Henderson demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

### CONCLUSION

For the foregoing reasons, this Court finds that Henderson's § 2254 habeas petition should be denied on the merits.  A certificate of appealability will not issue.  An appropriate Order accompanies this Opinion.

      s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

42